# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

MICHIGAN BELL TELEPHONE COMPANY, INCORPORATED, d/b/a AT&T MICHIGAN,

    Plaintiff,

v.

J. PETER LARK, LAURA CHAPPELLE, and MONICA MARTINEZ, in their Official Capacities as Commissioners of the Michigan Public Service Commission and not as Individuals,

    Defendants.

                 /

CASE NO. 06-12374
HON. MARIANNE O. BATTANI

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is Plaintiff Michigan Bell Telephone Company's Motion for Summary Judgment (Doc. No. 9). The Court heard oral argument on February 15, 2007, and at the conclusion of the hearing took this matter under advisement. For the reasons that follow, Plaintiff's motion is **GRANTED in part and DENIED in part.**

**I. INTRODUCTION**

Plaintiff Michigan Bell Telephone Company, d/b/a AT&T Michigan ("AT&T"), seeks declaratory and injunctive relief, pursuant to the Telecommunications Act of 1996, 47 U.S.C. § 151 et seq. It challenges three orders issued by the Michigan Public Service Commission ("MPSC"), acting through its Commissioners, Defendants J. Peter Lark, Laura Chappelle, and Monica Martinez, in case number U-1447. Plaintiff asserts that the MPSC's September 20, 2005, Order violates federal law. According to the Complaint, in

subsequent orders, dated December 20, 2005, and April 25, 2006, the MPSC extended its faulty analysis. AT&T seeks declaratory, injunctive, and other relief to set aside the challenged rulings.

## II. STATUTORY BACKGROUND AND STATEMENT OF FACTS

The Telecommunications Act of 1996 promotes competition in the previously monopoly-driven local telephone service market. See Verizon Communications, Inc. v. FCC, 535 U.S. 467, 475-76 (2002). It requires the incumbent local telephone service provider (AT&T Michigan in this case) to allow new market entrants to interconnect with and access the incumbent's network for a fair price. 47 U.S.C. § 251(c). Specifically, incumbent local exchange carriers ("ILECs") must allow competing carriers, known as competitive local exchange carriers ("CLECs"), to use the ILECs' networks, a practice known as "unbundling." See 47 U.S.C. § 251(c)(3).

The Act delegates the task of determining those network elements that must be unbundled to the Federal Communications Commission ("FCC"). In determining whether a network element should be unbundled, the Act requires the FCC to consider "at a minimum" whether "access to such network elements as are proprietary in nature is necessary" and whether "the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer." 47 U.S.C. § 251(d)(2). Pursuant to that authority, the FCC has issued a series of orders addressing the scope of ILECs' obligation to unbundle their network elements. The FCC's current set of unbundling rules were articulated in an Order issued February 4, 2005. See Order on Remand, In re Unbundled Access to Network

Elements, 20 FCCR 2533, 2005 WL 289015 (FCC rel. Feb. 4, 2005) ("TRRO"). The requirements were to take effect on March 11, 2005.

On February 22, 2005, AT&T notified competing carriers which wire centers AT&T determined were nonimpaired under the FCC's new rules. The MPSC subsequently issued an order initiating Case No. U-1447 to evaluate the implementation and objections thereto. Covad Communications Company (Covad), a CLEC, filed a self-certification with AT&T, claiming that it was entitled to unbundled DS1 loops[1] at the Dearborn Fairborn wire center pursuant to the unbundling requirements. AT&T had designated the Dearborn Fairborn wire center unimpaired under the new rules, and challenged Covad's self-certification.

On September 20, 2005, the MPSC issued an Order finding that Covad remained entitled to access unbundled DS1 loops at the Dearborn Fairborn wire center. The MPSC rejected challenges to its decision in orders dated December 20, 2005 (extending its analysis to other wire centers), and April 25, 2006 (removing the Saginaw wire center from AT&T's list of unimpaired wire centers).

The orders issued turn on the MPSC's interpretation of 47 C.F.R. § 51.319(a)(4)(i). It reads in relevant part:

> Subject to the cap described in paragraph (a)(4)(ii) of this section, an incumbent LEC shall provide a requesting telecommunications carrier with nondiscriminatory access to a DS1 loop on an unbundled basis to any building not served by a wire center with **at least 60,000 business lines and at least four fiber-based collocators**. Once a wire center exceeds both of these thresholds, no future DS1 loop unbundling will be required in that wire center. A DS1 loop is a digital local loop having a total digital signal speed of 1.544 megabytes per second. DS1 loops include, but are not limited to,

---

[1] DS1 loops are high capacity digital circuits capable of transmitting data at 1.544Mbps and may be used to provide up to 24 individual voice grade telephone lines.

> two-wire and four-wire copper loops capable of providing high-bit rate digital subscriber line services, including T1 services.

Id. (emphasis added).

Three disputes arise out of the interpretation of the regulation: whether AT&T serves more than 60,000 business lines at the wire center in question; what data should be reviewed in reaching the assessment; and whether there are at least 4 unaffiliated fiber-based collocators at that wire center. Each is addressed below.

## IV. STANDARD OF REVIEW

Under Rule 56(c), a court should grant a motion for summary judgment only if the evidence indicates that no genuine issue of material fact exists. To avoid summary judgment, the opposing party must set out sufficient evidence in the record to allow a reasonable jury to find for him at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

The moving party must show that there is an absence of evidence to support the non-moving party's case. Celotex v. Catrett, 477 U.S. 317, 325 (1986). "[A] party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. A court disposing of a summary judgment motion must consider the evidence in the light most favorable to the non-moving party. Matsushita, 475 U.S. 574.

## IV. DISCUSSION

Before turning to the specific objections raised, the Court observes that the FCC used the numeric thresholds in the regulation to create a "workable standard" for a nationwide impairment test that would still reflect a substantial degree of geographic specificity." TRRO at ¶ 44. The number of lines and fiber-based collocators shape impairment determinations by offering "proxies for where sufficient revenue opportunities exist" to justify a CLEC's deployment of its own high-capacity loops or transport to serve a particular wire center. TRRO at ¶ 93. With this background in mind, the Court addresses the matters raised in Plaintiff's motion.

### A. Business lines

The parties dispute the meaning of the language in the governing regulation specifying which lines should be counted. The Code of Federal Regulations, 47 C.F.R. § 51.5, provides the number of business lines "shall equal the sum of all incumbent LEC business switched access lines, plus the sum of all UNE loops connected to that wire center." In counting the business lines, the MPSC determined that only loops, whether UNE-P, UNE-L, or leased lines, that serve a business customer will be counted, whereas AT&T asserts that all lines should be counted. The Court finds the MPSC's interpretation violates the regulation.

The MPSC's position confuses the definition of a business line with the procedure used for counting a business line as specified in the governing regulation. "A business line is an incumbent LEC-owned switched access line used to serve a business customer." See 47 C.F.R. 51.5. Based upon this definition, the MPSC concluded that the phrase "all

UNE loops connected to that wire center" included only those UNE loops that can be shown to serve business clients." See Pl.'s Ex. A Sept. 20, 2005 Order at p. 4.

This interpretation ignores the plain language of the regulation. If the FCC wanted to include only business switched-access lines, it would have said so. The Court declines to transform the unambiguous phrase "all UNE loops" to mean only some UNE loops. Further support for the reading of the regulation advanced by AT&T can be gleaned from the FCC's rejection of an approach requiring "detailed and potentially subjective building-by-building and loop-by-loop evaluations" as impractical. TRRO at ¶ 159. The FCC instead based its business line count on data established by objective ILEC filings, concluding that "by basing our definition [of business line counts] on an ARMIS[2] filing required of incumbent LECs and adding UNE figures, which must also be reported, we can be confident in the accuracy of the thresholds, and a simplified ability to obtain the necessary information. Id. at ¶ 105. In contrast, the MPSC's approach requires the loop-by-loop analysis that the FCC explicitly rejected because the information is neither readily available or verifiable. The fact that AT&T, unlike many other ILECs, has that information, does not alter the approach articulated in the TRRO and regulation. Finally, the interpretation adopted by the MPSC has been rejected by the state commissions of Alabama, California, Florida, Georgia, Illinois, Indiana, Kansas, Ohio, South Carolina, Utah, Texas and Washington D.C. See Pl.'s Brief at pp. 22-23.

---

[2]Each year on April 1, ILECs file annual network, financial, and service quality data with the FCC's Automated Reporting Management Information System (ARMIS). The number of access lines in service is one type of data ILECs provide annually for FCC Report 43- 08 in the ARMIS Operating Data Report, which is referred to as ARMIS 43-08 data.

The Court therefore finds the MPSC misconstrued the regulation. Its interpretation violates federal law, and Plaintiff is entitled to a judgment on this claim.

**B. ARMIS data**

The parties are at odds over what data should be used to support the business line count. When AT&T designed the Dearborn wire center as unimpaired on February 22, 2005, it used the Automated Reporting Management Information System (ARMIS) data[3] from 2003. The 2003 ARMIS data was the most recent data reported to the FCC at the time of the designation.

The MPSC questioned the use of 2003 data and concluded the 2004 data should be used. It reasoned:

> The age of the data must be close enough in time to reflect conditions at the time that AT&T claims that the wire center is no longer impaired. In this case, the Commission finds that AT&T should have used the 2004 ARMIS data, which was available, even if not fully edited and incorporated in a report to the FCC. The analysis requires using data gathered for ARMIS calculations, not the calculations themselves.

Sept. 26, 2005 Order at p. 5.

The issue presented to this Court is whether MPSC's reliance on the December 31, 2004, data as opposed to the 2003 ARMIS 43-08 line counts, to determine impairment of a particular wire center violates federal law. In making that determination, the Court directs its attention to the Triennial Review Order and Order on Remand (TRRO).

In its TRRO at ¶ 105, the FCC stated that business lines counts are determined based upon an objective set of data that incumbent LECs already have created for other

---

[3]ARMIS 43-08 refers to reports filed by ILECs under the FCC's ARMIS rules. The report reflects the incumbent carrier's business switched access lines.

regulatory purposes. The FCC used the ARMIS 43-08 report to analyze the wire center data to calculate whether a wire center met the FCC's nonimpairment criteria. See TRRO at ¶ 105. The FCC chose business line counts as one of the wire center criteria, as they "are an objective set of data that incumbent [local exchange carriers] LECs [ILECs] already have created for other regulatory purposes," specifically identifying ARMIS 43-08 data as the source of business line data. Id.

Plaintiff contends that the use of unreported ARMIS information violates the FCC's rule that once a wire center passes the impairment threshold, it cannot be reclassified as impaired due to changes in the business line counts or number of fiber-based collocators. AT&T further asserts the use of unreported data violates the FCC's stated goal of reliance on objective data. See TRRO at ¶¶ 99, 105, 108. Plaintiff's position is correct to the extent that once a wire center is deemed unimpaired, it cannot be reclassified as impaired. Nevertheless, the FCC determined that disputes regarding nonimpairment designations must be resolved based upon the facts at the time of a designation. These specifications certainly preclude the MPSC from requiring data relative to counts <u>after</u> the date of designation. The count at the time of designation is what matters. Contrary to Plaintiff's position, the FCC identified in the TRRO only the type of data carriers should use in determining whether wire centers meet the non-impairment criteria. The FCC did not limit the MPSC to the use of data from a particular year when applying the criteria to particular wire centers.

The Court acknowledges that when the FCC released the TRRO on February 4, 2005, with an effective date of March 11, 2005, it did not use the 2004 business line data already collected by the ILECs. Nevertheless, Defendants were free to determine that use

of December 2004 ARMIS data would provide a more accurate picture of competition at the time the FCC released the TRRO.  Nothing in the TRRO or FCC rules precludes the Commission from deciding this issue in a way that best promotes competition in the local telecommunications market.  These designations are permanent and materially affect the development of competition in Michigan.  Therefore, the Court declines to find that an evaluation, based upon the most current data available when the ILECs designated the wire center as nonimpaired, runs afoul of federal law.  The TRRO creates no mandatory use of 2003 data; nor does it mandate the use of reported data.  The Court therefore denies Plaintiff's motion on this claim.

### C. Calculation of the number of fiber-based collocators

Finally, the parties dispute whether cross-connected collocators should be counted in making the impairment determination.  The MPSC declined to include cross-connected collocators when counting the number of fiber-based collocators present in the Dearborn Fairborn wire center; AT&T included them.

Before turning to the arguments raised, the Court notes that the FCC used fiber-based collocators data because the data was simple to identify and collect. TRRO at ¶ 99. Moreover, the FCC considered fiber-based collocation to be a key factor in its transport impairment analysis. It reasoned that a sufficient number of fiber-based collocations shows the duplicability of an ILEC transport facility, which in turn shows a lack of impairment. TRRO at ¶ 96.  Such a finding eliminates an ILEC's duty to provide unbundled transport.

In the TRRO, the FCC noted that a collocation arrangement may be obtained by the competing carrier either pursuant to contract, tariff or. . .by less traditional collocation

arrangement such as "Verizon's CATT fiber termination arrangements." TRRO at ¶ 102. The regulation supporting the FCC's definition is more detailed. The term "fiber-based collocator" is defined as, "any carrier, unaffiliated with the incumbent LEC, that maintains a collocation arrangement in an incumbent LEC wire center, with active electrical power supply, and operates a fiber-optic cable or comparable transmission facility that:

(1) Terminates at a collocation arrangement within the wire center;

(2) Leaves the incumbent LEC wire center premises; and

(3) Is owned by a party other than the incumbent LEC or any affiliate of the incumbent LEC, except as set forth in this paragraph. Dark fiber obtained from an incumbent LEC on an indefeasible right of use basis shall be treated as non-incumbent LEC fiber-optic cable. Two or more affiliated fiber-based collocators in a single wire center shall collectively be counted as a single fiber-based collocator. For purposes of this paragraph, the term affiliate is defined by 47 U.S.C. 153(1) and any relevant interpretation in this Title.

47 C.F.R §51.5.

The MPSC articulated the reasoning for its decision that AT&T could not count a cross-connected collocator[4] as a fiber-based collocator, stating that "counting two fiber-based collocators, where a CLEC shares the collocation facilities of a fiber-based collocator, impermissible double counts collocators. In the Staff's view, each counted fiber-based collocator must have entrance and exit facilities." September 20, 2005 Order at 11. It added, "The arrangement in which one CLEC cross-connects to the facilities of another CLEC that is a fiber-based collocator does not increase the number of fiber-based

---

[4]The connection between the fiber-based collocators and the non-fiber-based collocators was accomplished by a cross-connect arrangement. A cross-connect is a cabling mechanism that connects one carrier's equipment to another carrier's equipment, which allows the cross-connecting carriers to use the other carrier's facilities.

collocators for purpose of this analysis." Id.  Nor does a cross-connected CLEC control or operate fiber facilities.  Id.  Based on this interpretation, the MPSC concluded that only three fiber-based collocators were present at the Dearborn Fairborn wire center. Therefore, Defendants deemed the wire center impaired, and found Covad remained entitled to have its orders for DS1 loops filled.  Id.

Plaintiff maintains that the MPSC undercounted the number of fiber-based collocators serving a wire center because it counted only competing carriers that own fiber optic facilities as fiber-based collocators.  The FCC rules require only operation.  The FCC refused to incorporate a requirement that the collocator "own" its own fiber cable or other transmission facility as part of the requirement that the collocator "operate" such facility.

The Court rejects AT&T's contention that the MPSC blurred the operation and ownership requirements.  The FCC found a fiber-based collocation could be obtained by the competing carrier pursuant to contract, tariff, or through less traditional collocation arrangements.  It required a indefeasible right of use (IRU) basis for purposes of counting. Based on the FCC's regulation, the MPSC properly concluded that collocators that are cross-connected to a lit fiber-based collocator should not be counted as fiber-based collocators.

The Court agrees that the term "operating" suggests more than use.  A collocator that operates a fiber-optic cable provides "surveillance of the integrity of the system, responds to trouble reports, and undertakes routine maintenance.  Cross-connecting collocators do not perform any of these functions and, thereby, do not qualify as operators of a fiber-optic cable." Southwestern Bell Telephone, L.P. v. NuVox Communications of Kansas, Inc., 2006 WL 2360900 at * 7 (Kansas State Corporation Commission June 2,

2006). Similar conclusions have been reached by the New Hampshire PUC (to operate a fiber cable, a CLEC must be able to control not only the lighting of the fiber within it, but a broader range of functions, such as the placement, capacity and configuration of the cable itself), and the Texas PUC (a CLEC that uses a cross-connection to gain access to the fiber-optic cable or comparable transmission facility is not considered a fiber-based collocator) in reaching this interpretation. Id. at ¶ 37; See also In re Illinois Bell Telephone Co., 2006 WL 4049768 (Ill. C.C. December 6, 2006).

The FCC's definition of a fiber-based collocator spells out several situations that qualify a collocator for wire center designations: 1) a collocator that has installed its own fiber, 2) a collocator that obtains fiber from a carrier other than the ILEC, and 3) a collocator that obtains fiber from the ILEC on an indefeasible right of use ('IRU') basis. The cross-connected carrier does not clearly fall into any of these three definitions, nor does it meet the definition of fiber-based collocator when read in conjunction with the FCC's other statements in the TRRO. Specifically in ¶ 96, the FCC stated that the presence of fiber-based collocators signals that significant revenue is available and the duplicability of the ILECs network elements. Also in ¶ 98, the FCC looked at the high costs involved with fiber deployment when defining impairment. Finally in ¶ 161, the FCC recognized that fiber-based collocators indicate the presence of extensive competitive fiber rings. The presence of several carriers with fiber facilities in a single wire center indicates that the market condition of the wire center is one that can economically support the deployment of CLEC fiber facilities. Counting one FBC's investment in fiber facilities more than once does not show that the wire center can economically support the deployment of multiple CLEC fiber facilities. In essence, AT&T double-counted a CLEC that has made the investment to

install all the facilities and duplicate the ILEC's network. The first CLEC that has installed the fiber transport facilities has duplicated the ILEC's network. The second CLEC has not.

Accordingly, the Court agrees with Defendants that when a fiber-based collocator is cross-connected with another collocator, the second cross-connected collocator should not be counted as a fiber-based collocator for purposes of determining wire center designations.

## VI.  CONCLUSION

The MPSC cannot act in a manner inconsistent with federal law.  Here, Defendants' interpretation of how to count business lines violates the federal regulations; however the use of the 2004 ARMIS data to count the business lines did not.  Finally, the MPSC's exclusion of cross-connected collocators from its count of fiber-based collocators is consistent with the federal regulations.

Accordingly, Plaintiff's motion is **GRANTED** in part and **DENIED** in part.

Defendants are hereby **ENJOINED** from enforcing the September 20, 2005 Order, the December 20, 2005 Order and the April 25, 2006 Order in Case Number U-1447 to the extent that it is inconsistent with this Court's ruling.

Plaintiff shall present a proposed judgment agreed upon as to form, within five days of the date of this order.  Any objection thereto must be filed within seven days of the date of this order.

**IT IS SO ORDERED.**

                                      s/Marianne O. Battani
                                      MARIANNE O. BATTANI
                                      UNITED STATES DISTRICT JUDGE

Dated: May 8, 2007

## CERTIFICATE OF SERVICE

Copies of this Order were mailed to counsel of record on this date by ordinary mail and/or electronic filing.

                                      s/Bernadette M. Thebolt
                                      Deputy Clerk